## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

Case No.  12-31395

MICHAEL BRENT WARD
aka BRENT WARD

        Debtor


    LUNN REAL ESTATE INVESTMENTS, LLC

        Plaintiff

      v.

Adv. Proc. No.  12-3069

    MICHAEL BRENT WARD

        Defendant


## M E M O R A N D U M


**APPEARANCES:**    GENTRY, TIPTON & MCLEMORE, P.C.
        Maurice K. Guinn, Esq.
        Post Office Box 1990
        Knoxville, Tennessee  37901
        Attorneys for Plaintiff

        BRACKETT & STRUNK, PLLC
        Brent T. Strunk, Esq.
        1104 Merchants Drive
        Suite 101
        Knoxville, Tennessee  37912
        Attorneys for Defendant/Debtor


**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint filed by the Plaintiff on August 31, 2012, asking the court to deny the Defendant's discharge under 11 U.S.C. § 727(a)(2), (3), (4), and/or (5) (2006).  The trial was held on September 10, 2013.  The record before the court consists of Stipulations filed by the parties on September 3, 2013, thirty exhibits introduced into evidence, and the testimony of four witnesses, Frederick Conrad, Jr., Kristin Ward, Warren Young, and the Defendant.

This is a core proceeding.  28 U.S.C. § 157(b)(2)(J) (2006).

## I

On June 2, 2008, the Plaintiff obtained an Agreed Judgment in the amount of $91,840.63 against the Defendant in the General Sessions Court for Knox County, Tennessee.  TRIAL EX. 1.  On July 20, 2009, the Defendant filed a Voluntary Petition commencing case number 09-33916 under Chapter 13 of the Bankruptcy Code (2009 Bankruptcy Case).  The Plaintiff objected to confirmation of the Defendant's proposed Chapter 13 plan, and the 2009 Bankruptcy Case was dismissed on November 11, 2009, on the Debtor's motion.  Thereafter, the Defendant filed a Voluntary Petition commencing case number 11-32364 under Chapter 13 of the Bankruptcy Code (2011 Bankruptcy Case) on May 16, 2011.  The Defendant's proposed Chapter 13 Plan was confirmed in the 2011 Bankruptcy Case on August 31, 2011, but was dismissed upon motion of the Chapter 13 Trustee on December 16, 2011, for delinquent payments.  The Defendant subsequently filed the Voluntary Petition commencing his present case, number 12-31395, under Chapter 7 of the Bankruptcy Code (2012 Bankruptcy Case) on March 30, 2012.  Although he was married to Kristin Ward at the time

2

each of his bankruptcy cases were filed, she did not join in his petitions and was not a debtor in any of the Defendant's cases.

The Plaintiff filed the Complaint initiating this adversary proceeding on August 31, 2012, objecting to the Defendant's discharge on the following grounds: (1) that the Defendant failed to disclose a right to payment from IDEV Technologies, Inc. (IDEV) in his Schedule B; (2) that the Defendant failed to disclose a $25,000.00 transfer to his mother-in-law made within one year of the filing of the 2012 Bankruptcy Case; (3) that the Defendant failed to disclose in his Statement of Financial Affairs his possession of a 1999 Lexus automobile owned by his mother-in-law; (4) that the Defendant misstated his employment status in his statements and schedules; (5) that the Defendant did not produce subpoenaed bank records at a July 25, 2012 deposition; (6) that the Defendant did not maintain records to account for approximately $131,000.00 in transfers from his bank accounts; and (7) that the Defendant misstated the amount of a federal income tax refund. As set forth in the Pretrial Order entered on November 27, 2012, the issues before the court are as follows: (1) whether the Defendant, with intent to hinder, delay, or defraud creditors, transferred, removed, concealed, or permitted to be transferred, removed, or concealed, property within one year before the filing of the 2012 Bankruptcy Case; (2) whether the Defendant concealed, destroyed, mutilated, falsified, or failed to keep or preserve records from which his financial condition or business transactions could be ascertained and, if so, whether such failures were justified under the circumstances of his case; (3) whether the Defendant knowingly and fraudulently made a false oath or account in connection with the 2012 Bankruptcy Case; and (4) whether the Defendant has failed to satisfactorily explain the loss of assets to meet his liabilities.

3

## II

A Chapter 7 discharge relieves an "honest but unfortunate" debtor of his or her debts, allowing a "fresh start" through the discharge. *Buckeye Retirement, LLC v. Heil (In re Heil)*, 289 B.R. 897, 901 (Bankr. E.D. Tenn. 2003) (citations omitted). A debtor receives a general discharge of all prepetition debts under 11 U.S.C. § 727(a) (2006) unless one of the ten express limitations exists, including, as are relevant to this adversary proceeding, the following:

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case [or];

(4) the debtor knowing and fraudulently, in or in connection with the case—

(A) made a false oath or account;

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]

11 U.S.C.A. § 727(a). These limitations furnish creditors with "a vehicle under which *abusive* debtor conduct can be dealt with by denial of discharge." *Blockman v. Becker (In re Becker)*, 74 B.R. 233, 236 (Bankr. E.D. Tenn. 1987) (quoting *Harman v. Brown (In re Brown)*, 56 B.R. 63,

4

66 (Bankr. D.N.H. 1985)).  Section 727(a) is liberally construed in favor of the debtor, and the party objecting to discharge bears the burden of proof by a preponderance of the evidence.  *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000); *Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 393 (6th Cir. 1994); Fed. R. Bankr. P. 4005.

## A

The Plaintiff has objected to the Defendant's discharge under § 727(a)(4)(A), which requires proof that the Defendant (1) made a statement under oath; (2) the statement was false; (3) the Defendant knew that the statement was false when he made it; (4) the Defendant fraudulently intended to make the statement; and (5) the statement materially related to the bankruptcy case. *Ayers v. Babb (In re Babb)*, 358 B.R. 343, 355 (Bankr. E.D. Tenn. 2006) (citing 11 U.S.C. § 727(a)(4)(A)).  "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to do costly investigations."  *United States Trustee v. Zhang (In re Zhang)*, 463 B.R. 66, 86 (Bankr. S.D. Ohio 2012) (quoting *Jahn v. Flemings (In re Flemings)*, 433 B.R. 230, 237 (Bankr. E.D. Tenn. 2010)).  "Any debtor who files a Chapter 7 petition has a continuous, affirmative duty to disclose the following in a complete and accurate manner: (a) a list of creditors; (b) schedules of assets, liabilities, current income, and current expenditures; and (c) a statement of financial affairs."  *Wilson & Muir Bank & Trust Co. v. Eifler (In re Eifler)*, 2013 WL 3300639, at *26, 2013 Bankr. LEXIS 2654, at *68-69 (Bankr. W.D. Ky. July 1, 2013).

Both affirmative false statements and omissions fall within the scope of § 727(a)(4)(A),

*Searles v. Riley (In re Searles)*, 317 B.R. 368, 377 (B.A.P. 9th Cir. 2004), and statements are material

if related to a debtor's bankruptcy estate, the existence and disposition of property, business

enterprises or transactions, and/or matters pertinent to the discovery of assets. *Keeney*, 227 F.3d at

686; *Lim v. Storozhenko (In re Storozhenko)*, 487 B.R. 457, 466 (Bankr. E.D. Mich. 2012).

Additionally, "statements under oath" that fall within the scope of § 727(a)(4)(A) include bankruptcy

statements and schedules, which are executed under penalty of perjury, and testimony given by a

debtor at the meeting of creditors, in a deposition, or in a 2004 examination. *Babb*, 358 at 355.

Fraudulent intent is often discerned from a debtor's conduct, demonstrated by material

representations or omissions that the debtor knows are false and are likely to create an erroneous

impression, as well as reckless disregard or indifference for the truth exhibited by continuing patterns

of omissions and/or false statements in his bankruptcy schedules. *Keeney*, 227 F.3d at 685; *see also*

*Crocker v. Abad (In re Abad)*, 485 B.R. 369, 374 (Bankr. W.D. Ky. 2013). Intent is inferred from

circumstantial evidence and often turns on the debtor's credibility and demeanor. *Babb*, 358 B.R.

at 355 (quoting *Noland v. Johnson (In re Johnson)*, 387 B.R. 728, 743 (Bankr. S.D. Ohio 2008) and

*LaRocco v. Smithers (In re Smithers)*, 342 B.R. 384 (Table), 2006 WL 509396, at *3, 2006 Bankr.

LEXIS 265, at *9 (B.A.P. 6th Cir. Mar. 2, 2006) (quoting *Groman v. Watman (In re Watman)*,

301 F.3d 3, 8 (1st Cir. 2002)). Additionally, "[t]he elements of 'knowingly' and 'fraudulently' may

not be conflated. They each must be proven." *Abbey v. Retz (In re Retz)*, 364 B.R. 742, 754 (Bankr.

D. Mont. 2007). "Knowledge that a statement is false can be evidenced by a demonstration that the

debtor 'knew the truth, but nonetheless failed to give the information or gave contradictory

6

information.'"  *Babb*, 358 B.R. at 355 (quoting *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725

(B.A.P. 6th Cir. 1999)).  "[W]hile mistakes do not warrant a denial of discharge, reckless indifference

or disregard can provide the foundation for a finding of fraudulent intent."  *Noland*, 387 B.R. at 743;

*Hamo*, 233 B.R. at 724-25.

On the other hand, "[a] false statement resulting from ignorance or carelessness does not rise

to the level of 'knowing and fraudulent.'"  *Retz*, 364 B.R. at 754 (quoting *Roberts v. Erhard (In re*

*Roberts)*, 331 B.R. 876, 884 (B.A.P. 9th Cir. 2005)).  It is, likewise, "well established that a court

may consider the debtor's subsequent voluntary disclosure as evidence of innocent intent[,]" *Kelly*,

135 B.R. at 461, and a debtor who mistakenly or inadvertently provides false information or fails to

disclose pertinent information and takes steps to amend his schedules to correct them prior to or

during a meeting of creditors is not generally thought to possess the requisite fraudulent intent to

deny discharge under § 727(a)(4)(A).  *Keeney*, 227 F.3d at 686; *Babb*, 358 B.R. at 355-56.

> Since interested parties should not be required to drag the truth from the debtor, a
> showing of good faith in a § 727(a)(4)(A) matter will often come down to whether
> a debtor has abided by this cardinal rule: when in doubt, disclose.  For example, a
> debtor is likely to be forgiven for simply mislabeling an asset, where its existence is
> still initially disclosed.  However, where a debtor only voluntarily discloses
> information after its existence is uncovered by a third-party (e.g., a trustee or
> creditor), good faith is unlikely to be found.

*Babb*, 358 B.R. at 356 (brackets and citation omitted).

The record reflects that the Defendant failed to disclose a number of material facts in the

statements and schedules filed in his 2012 bankruptcy case on March 30, 2012.  First,

notwithstanding that he had signed an agreement for employment with IDEV on January 27, 2012,

under which he was to be paid on a commission basis and reimbursed for expenses, the Defendant's

Schedule I expressly states that he is "Not Employed" and does not disclose a right to payment in his Schedule B even though he was clearly performing services for IDEV prior to his bankruptcy filing, as evidenced by the fact that he received $1,776.00 for that work on April 6, 2012, for the period of March 19 through April 1, 2012, and he had been receiving expense reimbursements beginning in February 2012.  *See* COLL. TRIAL EX. 4; COLL. TRIAL EX. 10.  Similarly, his payments from IDEV were not reflected as income or otherwise in his Statement of Financial Affairs.  TRIAL EX. 3.  The Defendant also understated his anticipated one-half interest in his and Mrs. Ward's 2011 federal tax refund, scheduling $2,500.00 when the actual amount received was $8,763.00, a figure in line with the $7,959.00 refund received in 2010 when they had reported a similar adjusted gross income.  COLL. TRIAL EX. 4; *see also* TRIAL EX. 5; TRIAL EX. 6.  In addition, the Defendant did not disclose his possession of a 1999 Lexus owned by his former mother-in-law, who he testified later gifted the vehicle to him postpetition.  The Defendant likewise did not disclose the unexpired lease for the home he and Mrs. Ward were renting in Oak Ridge in his Schedule G, although they moved into the home in February 2012, and were making lease payments of $1,650.00 per month, nor did he disclose the security and pet deposits paid prior to moving into the house.  The Defendant also did not disclose a right to an insurance payment from a minor accident that Mrs. Ward had been involved in.  At trial, the Defendant testified that he had an $11,000.00 Roth IRA that was not jointly owned with Mrs. Ward; however, the only Roth IRA disclosed by the Defendant in Schedule B is a jointly owned account with Mrs. Ward in which the Defendant's interest was $16,000.00.  COLL. TRIAL EX. 4.

8

During cross-examination, the Defendant testified concerning his employment status, tax refund, possession of the Lexus, and disclosure of other rights to payment. With respect to his employment with IDEV, the Defendant testified that he realized limited commission income on a contract that lasted only six months and that he had not disclosed it because he was a 1099 employee. He also testified that he believes that he disclosed the amount of his 2011 tax refund at his meeting of creditors and his possession of the 1999 Lexus, which was in poor condition when his mother-in-law loaned it to him following his job loss with Abbott Laboratories and the repossession of his 2007 Nissan Maxima, after which the Chapter 7 Trustee filed a report of no distribution. The Defendant did not, however, offer any real explanation as to why he had not listed the Lexus in his statements and schedules; instead, he testified as to its condition and estimated $500.00 value. With respect to the amount of the anticipated tax refund, the Defendant testified that the $2,500.00 was a good faith estimate, that he did not look back to his 2010 tax return when completing his statements and schedules, and that he did not recall the amount of that refund, which had been deposited into his joint account with Mrs. Ward via direct deposit. With respect to the lease for the home in Oak Ridge that was not listed in his Schedule G, the Defendant testified that he does not know why it was not listed because he was living there at the time he filed his case. He also acknowledged that the security deposit for the house of one month's rent plus a $500.00 pet fee were not disclosed in his Schedule B. Finally, the Defendant testified that he did not disclose a right to an insurance payment because he did not know that he had to. He acknowledged that none of his bankruptcy schedules were amended to correct any of these omissions and misstatements.[1]

---

[1] The Plaintiff also presented proof that, on May 18, 2011, two days after the 2011 Bankruptcy Case was filed, a deposit of $27,061.27 was made into the Covenant Health Credit Union account belonging to Mrs. Ward, who testified

(continued...)

Based upon the foregoing, the court finds that the Defendant knowingly and fraudulently made false statements in his statements and schedules and gave conflicting testimony at trial sufficient to deny his discharge under § 727(a)(4)(A).  As to the "knowing" requirement, there is no dispute what the Defendant knew at the time that he filed his statements and schedules.  First, he knew that he had entered into an employment agreement in January 2012 with IDEV to receive a commissioned salary and reimbursement of expenses, and that he had already been performing services on IDEV's behalf when he filed the 2012 Bankruptcy Case.  *See* TRIAL EX. 7; TRIAL EX. 8; TRIAL EX. 9.  In fact, on March 10, 2012, the Defendant sent an email to his contacts with IDEV stating that he "received my first paycheck from IDEV[.]"  TRIAL EX. 8.  Additionally, the Defendant received expense reimbursements from IDEV beginning in February 2012.  COLL. TRIAL EX. 10. He also knew that he was driving the 1999 Lexus automobile owned by his mother-in-law, although the vehicle is not listed anywhere within his statements and schedules.  *See* TRIAL EX. 3; COLL. TRIAL EX. 4.  Finally, the Defendant knew that he had leased a home in Oak Ridge, that he had moved into the house in February, one month before he filed the 2012 Bankruptcy Case, and that his Schedule J reflects the rent payment of $1,650.00, compared to the $3,800.00 housing payment listed

---

[1](...continued)
that she believed the source was a combination of income taxes and money the Defendant paid her back.  Then, in January 2012, two months before he filed the 2012 Bankruptcy Case, Mrs. Ward transferred $25,000.00 to her mother, Judy D. Wilson, who agreed to help the Defendant and Mrs. Ward pay a $1,650.00 monthly residential lease payment. The Plaintiff argued that the Defendant's failure to list either of these transfers in his Statement of Financial Affairs also falls within the scope of § 727(a)(4)(A).  The court disagrees.  At trial, the Defendant testified that he did not know about the $25,000.00 transfer from Mrs. Ward to Ms. Wilson, that he had turned over responsibility for all of the household finances to Mrs. Ward, who received financial assistance from Ms. Wilson, and that he had no access to Mrs. Ward's personal accounts and was not aware of any of the funds therein.  His testimony was collaborated by Mrs. Ward, who testified that she had set aside those funds in anticipation of filing for divorce and did not tell the Defendant about doing so or about the transfer to her mother.

in Schedule J filed in the 2011 Bankruptcy Case. *Compare* COLL. TRIAL EX. 4 *with* COLL. TRIAL EX. 27; *see also* TRIAL EX. 12.

Additionally, the court finds that there is really no dispute with respect to the "fraudulent" requirement of § 727(a)(4)(A). As discussed, the Defendant knew that he was employed by IDEV, even if on a commission basis. Although he testified at trial that he did not receive his first "1099 paycheck" until April, his March 8, 2012 email to his contacts with IDEV expressly stated that he had received his "first paycheck," in addition to the fact that paycheck stubs reflect that he had been receiving reimbursement for expenses since February 2012; however, his Statement of Financial Affairs states that he had received "no income" for 2012, and his Schedule I reflects that he was "Not Employed." TRIAL EX. 3; COLL. TRIAL EX. 4; TRIAL EX. 8; COLL. TRIAL EX. 10. The Defendant's testimony at trial that he had not disclosed his employment with IDEV because he was a 1099 employee does not satisfactorily explain his failure to list in either his Statement of Financial Affairs or his Schedule I something as crucial for ascertaining his financial picture as employment and/or income. This omission, standing alone, is sufficient to deny the Defendant's discharge but is even more demonstrative of the Defendant's intent in conjunction with the other misstatements in his statements and schedules – his failure to list in his Statement of Financial Affairs or anywhere within his schedules the 1999 Lexus owned by his mother-in-law that he was driving, his failure to list the unexpired lease for his house in Oak Ridge in Schedule G or to list the security deposit for the house in Schedule B, his failure to list a right to payment for an insurance claim in his Schedule B, the understated anticipated tax refund listed in Schedule B, especially in light of the similar income to the previous year for which his refund was significantly higher, and his failure to disclose in

Schedule B a Roth IRA that he testified at trial he owned solely – and his reckless indifference not only to making the disclosure on the front end but also to amending them.  The number of omissions and inconsistencies evidence that the Defendant knowingly and fraudulently made false statements within his statements and schedules filed in the 2012 Bankruptcy Case, and his discharge will be denied under § 727(a)(4)(A).[2]

B

The Plaintiff has also objected to the Defendant's discharge under § 727(a)(5), alleging that he has not adequately explained a loss or deficiency of assets.  "The court has broad power under § 727(a)(5) to decline to grant a discharge . . . where the debtor does not adequately explain a shortage, loss, or disappearance of assets."  *Hendon v. Lufkin (In re Lufkin)*, 393 B.R. 585, 595 (Bankr. E.D. Tenn. 2008) (quoting *In re D'Agnese*, 86 F.3d 732, 734 (7th Cir. 1996) (brackets omitted)).  The Plaintiff bears the initial burden of establishing the loss or deficiency of assets by demonstrating that (1) at a time not too remote from the bankruptcy, the Defendant owned identifiable assets; (2) on the day that he commenced his bankruptcy case, the Defendant no longer owned the particular assets in question; and (3) his schedules and/or the pleadings in the bankruptcy case do not offer an adequate explanation for the disposition of the assets in question.  *Schilling v. O'Bryan (In re O'Bryan)*, 246 B.R. 271, 279 (Bankr. W.D. Ky. 1999).  Nevertheless, "noticeably

---

[2] The record also reflects that the Defendant filed statements and schedules with omissions and errors in his two prior cases.  In particular, the Defendant's Schedule I filed in the 2009 Bankruptcy Case significantly understated his monthly income.  Similarly, the record reflects that the Defendant provided false income information for the Defendant in a rental credit application dated January 26, 2012, for their rental house in Oak Ridge, Tennessee.  Although those falsities cannot form the basis for a denial of discharge in this case, they are nevertheless relevant in that they evidence a continued pattern of misstatements by the Defendant and are indicative of his careless disregard concerning the accuracy of documents filed in his bankruptcy cases.

lacking from § 727(a)(5) is any element of wrongful intent or, for that matter, any affirmative defenses – § 727(a)(5) simply imposes strict liability[;]" thus, the Plaintiff does not have to prove that the Defendant acted knowingly or fraudulently with respect to this dissipation of assets. *Baker v. Reed (In re Reed)*, 310 B.R. 363, 368 (Bankr. N.D. Ohio 2004).

Once the deficiency of assets is shown, the burden then shifts to the defendant to provide a satisfactory explanation of the whereabouts of the assets. *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984). Any explanation "'must consist of more than . . . vague, indefinite, and uncorroborated' assertions by the debtor," *D'Agnese*, 86 F.3d at 734 (quoting *Baum v. Earl Millikin, Inc. (In re Baum)*, 359 F.2d 811, 814 (7th Cir. 1966)), and must be reasonable and credible, such that the court is convinced that the debtor is acting in good faith. *Fed. Deposit Ins. Corp. v. Hendren (In re Hendren)*, 51 B.R. 781, 788 (Bankr. E.D. Tenn. 1985). "When deciding whether a debtor's explanation is satisfactory, 'the issue is whether the explanation satisfactorily describes what happened to assets; not whether what happened to assets was proper.'" *Clippard v. Jarrett (In re Jarrett)*, 417 B.R. 896, 905-06 (Bankr. W.D. Tenn. 2009) (quoting *Shappell's Inc. v. Perry (In re Perry)*, 252 B.R. 541, 550 (Bankr. M.D. Fla. 2000)). Furthermore, the defendant's explanation should be supported by sufficient documentation that eliminates any requirement upon the court to speculate what happened to the defendant's assets. *Lufkin*, 393 B.R. at 595 (citations omitted).

The court finds that the Plaintiff has sufficiently met its burden of proving that the Defendant had significant funds in the years and months prior to filing the 2012 Bankruptcy Case, derived in large part from his income earned while he was employed by Abbott Laboratories, that he did not

possess at the time he filed the 2012 Bankruptcy Case.  At trial, the Defendant testified that he earned more than $200,000.00 in both 2010 and 2011 through his employment with Abbott Laboratories, and his 2010 tax return evidences that he and Mrs. Ward had adjusted gross income of $248,204.00, while their 2011 tax return shows adjusted gross income of $210,944.00.  COLL. TRIAL EX. 5; COLL. TRIAL EX. 6.  Additionally, the bank records produced by the Defendant for 2010 and 2011 reflect substantial deposits into the Knoxville TVA Employees Credit Union account, the majority of which were direct deposits from Abbott Laboratories: (1) $13,745.21 in March 2010; (2) $15,180.19 in April 2010; (3) $9,023.33 in May 2010; (4) $12,923.15 in June 2010; (5) $11,971.67 in July 2010; (6) $9,136.82 in August 2010; (7) $14,643.71 in September 2010; (8) $13,700.17 in October 2010; (9) $15,862.52 in November 2010; (10) $13,531.20 in December 2010; (11) $13,883.13 in January 2011; (12) $12,952.54 in February 2011; (13) $12,235.61 in March 2011; and (14) $13,995.16 in April 2011.  COLL. TRIAL EX. 13; COLL. TRIAL EX. 15; TRIAL EX. 17. Based upon these bank records, the total amount deposited into the Defendant's Knoxville TVA Employees Credit Union account between March 2010 and April 2011 was $182,784.41.

Likewise, the Plaintiff has met its burden and proved that the Defendant's financial records reflect miscellaneous debits totaling $154,495.13 between March 2010 and April 2011, and that the Defendant no longer possesses those funds or ample property in connection therewith.  The same bank records with Knoxville TVA Employees Credit Union reflect the following miscellaneous debits: (1) $8,087.70 in March 2010; (2) $12,403.26 in April 2010; (3) $5,703.08 in May 2010; (4) $13,326.35 in June 2010; (5) $12,063.42 in July 2010; (6) $11,377.23 in August 2010; (7) $9,825.02 in September 2010; (8) $9,808.60 in October 2010; (9) $13,023.07 in November 2010;

14

(10) $15,227.49 in December 2010; (11) $8,824.93 in January 2011; (12) $15,671.15 in February 2011; (13) $12,922.34 in March 2011; and (14) $6,231.49 in April 2011.  COLL. TRIAL EX. 13; COLL. TRIAL EX. 15; TRIAL EX. 17. With the exception of those for December 2010, March 2011, and April 2011 statements, none of the bank statements include an itemized breakdown of the miscellaneous debits, and none of those transactions were identified or disclosed by the Defendant in his Statement of Financial Affairs filed in the 2012 Bankruptcy Case to adequately explain what happened to the substantial income earned by the Defendant during that same time period.  *See* TRIAL EX. 3;  TRIAL EX. 14;  TRIAL EX. 16; TRIAL EX. 17.  Additionally, Schedule B - Personal Property filed in the 2012 Bankruptcy Case reflects assets held by the Defendant with an aggregate value of $33,465.00.  COLL. TRIAL EX. 4.

The Defendant's burden of proof to provide a satisfactory explanation as to the disposition of his assets has not been satisfied.  At trial, he testified that he was in a Chapter 13 bankruptcy case from May to December 2011, which would explain the disposition of his income during that time. To that end, the Defendant provided a printout of transactions for July 2011 through July 2012 for the joint account he and Mrs. Ward held at ORNL Federal Credit Union.  COLL. TRIAL EX. 19. Nevertheless, this transaction printout reflects spending as well as a number of unidentified cash withdrawals and paid out checks, evidencing that a great deal of the Defendant's income was being spent elsewhere than being paid to the Chapter 13 Trustee and is, accordingly, unaccounted for.

Under the terms of his confirmed Chapter 13 Plan, the Defendant was required to make bi-weekly payments of $3,470.00 to the Chapter 13 Trustee.  In July 2011, the transaction printout reflects a beginning balance of $10,807.71, payroll deposits totaling $12,548.68, a $500.00 deposit

from an unknown source, three $3,470.00 payments via check to the Chapter 13 Trustee, transfers

to share account #-00 $800.00, ATM and cash withdrawals totaling $1,153.00, unidentified checks

totaling $2,502.75, additional debits totaling $4,547.45,[3] and an ending balance of $4,423.24. COLL.

TRIAL EX. 19.  In August 2011, the transaction printout reflects payroll deposits totaling $11,191.07,

one $3,470.00 payment via check to the Chapter 13 Trustee, transfers totaling $300.00 to share

account #-00, ATM withdrawals totaling $1,009.50, unidentified checks totaling $454.81, additional

debits totaling $4,743.22,[4] and an ending balance of $5,276.55.  COLL. TRIAL EX. 19.  In September

2011, the transaction printout reflects payroll deposits totaling $14,250.87, two $3,470.00 payments

via check to the Chapter 13 Trustee, ATM and cash withdrawals totaling $1,160.00, unidentified

---

[3] The miscellaneous debits for each month include certain monthly recurring bills for insurance and television and phone service.  The monthly breakdowns also include additional debits for various gas stations, restaurants, liquor stores, hotels, and assorted services and retail establishments.  Specifically, the July 2011 statement reflects that the following aggregate amounts were spent on the following:  $38.66 to Tractor Supply; $15.00 to Regal Cinemas; $90.68 to Walgreens; $32.17 to M&M Catering; $120.56 to Target; $318.28 to Weigels; $12.95 to TIVO; $8.92 to Dunkin Donuts; $370.50 to Verizon Wireless; $697.06 to Wal-Mart; $4.47 to Parkwest Dietary Office; $113.21 to Food City; $56.80 to Staples; $863.71 to Chase; $106.32 to Lange's Liquor Store; $5.36 to Sonic; $47.00 to Ross the Boss; $118.44 to AT&T; $1.62 to FedEx Office; $114.63 to DirecTv; $30.90 to Lowe's; $11.00 to 3-Minute Magic; $32.65 to CVS Pharmacy; $187.85 to Bimbo's Fireworks; $173.66 to Kroger; $170.36 to Rafferty's; $25.00 to Ruby Tuesday; $37.12 to Turkey Creek Wine & Spirits; $73.34 to Wasabi; $53.04 to Shell Oil Company; $6.00 to Time to Shine Car Wash; $163.10 to Marriott; $34.00 to Museum of Appalachia; $24.44 to KFC; $5.23 to Keva Juice; $11.48 to Steak N Shake; $178.89 to Tennessee Farmers Insurance; $159.05 to Chick-fil-a; $12.00 to Home Depot; and $22.00 to O'Charleys.

[4] Specifically, the August 2011 statement reflects that the following aggregate amounts were spent on the following:  $10.00 to The Rush; $185.81 to Sam's Club; $180.01 to Ted Russell Nissan; $11.49 to Sonic; $503.63 to Weigels; $19.04 to FedEx Office; $6.42 to Marble Slab Creamery; $12.95 to TIVO; $22.67 to Gigi's Cupcakes; $59.82 to Bonefish; $33.81 to C&D Tire; $69.78 to Lenoir City Animal Clinic; $297.34 to Kroger; $180.20 to Lange's Liquor Store; $32.92 to Mellow Mushroom; $218.45 to The Walking Company; $31.17 to Walgreens; $123.23 to JCPenney; $5.24 to Pilot; $242.83 to Wal-Mart; $118.18 to AT&T; $248.69 to Gap; $114.63 to DirecTv; $102.05 to Food City; $99.40 to CVS Pharmacy; $28.17 to Famous Dave's; $603.51 to Verizon Wireless; $67.63 to Lowe's; $28.31 to Fresh Market; $32.20 to Denny's; $30.50 to Exxon/Mobil; $31.53 to Marathon Oil; $46.00 to Watermark Operating; $26.69 to Cheesecake Factory; $70.00 to J Paul's Harborplace; $22.00 to Sharpshooter; $60.00 to Washington Metrorail; $14.00 to Courtyard by Marriott; $13.86 to an unknown restaurant in Washington, DC; $34.50 to Ruth's; $105.03 to Legal Sea Foods; $50.27 to Sheetz; $20.00 to Quick-ette; $371.39 to Sheraton; $54.00 to Metropolitan Knoxville; $50.00 to American Airlines; $42.78 to D&D Performance; and $10.82 to NIVA Dallas Gift Shop.  COLL. TRIAL EX. 19.

checks totaling $1,871.02, additional debits totaling $2,581.04,[5] and an ending balance of $6,975.36.

COLL. TRIAL EX. 19.   In October 2011, the transaction printout reflects payroll deposits totaling

$16,539.25, two $3,470.00 payments via check to the Chapter 13 Trustee, ATM withdrawals totaling

$1,680.00, unidentified checks totaling $530.23, additional debits totaling $3,359.89,[6] and an ending

balance of $11,002.49.   COLL. TRIAL EX. 19.   In November 2011, the transaction printout reflects

payroll deposits totaling $3,137.73, one $3,470.00 payment via check to the Chapter 13 Trustee,

transfers totaling $300.00 to share account #-00, ATM withdrawals totaling $923.00, unidentified

checks totaling $1,386.30, additional debits totaling $5,707.03,[7] and an ending balance of $2,353.19.

---

[5] Specifically, the September 2011 statement reflects that the following aggregate amounts were spent on the following:  $10.00 to The Rush; $9.60 to Vic and Bills; $56.09 to Food City; $37.66 to CVS Pharmacy; $65.00 to MMC West Registration; $17.41 to Subway; $12.95 to TIVO; $10.72 to Pizza Hut; $306.32 to Kroger; $80.95 to Lambert's Healthcare; $248.41 to Weigels; $27.90 to Panera Bread; $53.49 to Spirit of Halloween; $51.98 to Pilot; $268.46 to Wal-Mart; $41.49 to Best Buy; $9.83 to Valley Farmers Cooperative; $118.29 to AT&T; $50.90 to Lowe's; $10.14 to Sonic; $25.00 to CMM Miriam B. Tedder, M.D.; $32.47 to Walgreens; $13.50 to Cracker Barrel; $3.41 to FedEx Office; $20.00 to 3-Minute Magic; $10.62 to Big Lots; $114.63 to DirecTv; $114.96 to 1-800-PETMEDS; $200.00 to Chase; $12.76 to Noodles & Co.; $308.12 to Verizon Wireless; $1.09 to Redbox; $178.89 to Tennessee Farmers Insurance; and $58.00 to Kenjo Market.  COLL. TRIAL EX. 19.

[6] Specifically, the October 2011 statement reflects that the following aggregate amounts were spent on the following:  $39.00 to The Rush; $61.72 to CVS Pharmacy; $248.00 to The Brown Bag Catering; $254.14 to Weigels; $348.51 to Kroger; $12.95 to TIVO; $544.26 to Oak Ridge Nissan; $11.56 to Bellacinos Pizza; $28.34 to FedEx Office; $24.65 to Buffalo Wild Wings; $118.29 to AT&T; $48.44 to Food City; $114.63 to DirecTv; $61.25 to Kenjo Market; $21.41 to Steamboat; $26.25 to Shell Oil Company; $22.74 to Olive Garden; $239.82 to Sam's Club; $57.46 to Exxon/Mobil; $18.34 to Wendy's; $4.58 to Parkwest Dietary Office; $39.68 to Cracker Barrel; $29.72 to Fresh Market; $64.59 to Walgreens; $28.33 to KFC; $180.07 to Hilton Hotels; $27.44 to Anderson County Farmers; $16.10 to Ruby Tuesday; $5.45 to Pat's Gifts & Etc.; $42.77 to Farragut Cleaners; $52.44 to Soccer USA; $17.00 to Regal Cinemas; $40.73 to Bonefish; $90.00 to Nail Trix; $134.74 to Wal-Mart; $34.09 to M&M Catering; $9.60 to Vic and Bills; $178.89 to Tennessee Farmers Insurance; $10.30 to Lenoir City Animal Clinic; $40.61 to Pittsburgh Paints; and $11.00 to 3-Minute Magic.  COLL. TRIAL EX. 19.

[7] Specifically, the November 2011 statement reflects that the following aggregate amounts were spent on the following:  $61.65 to Walgreens; $10.00 to The Rush; $255.10 to Food City; $527.57 to Weigels; $302.14 to Wal-Mart; $405.81 to CVS Pharmacy; $12.95 to TIVO; $62.66 to Red Lobster; $5.94 to Kroger; $333.44 to Lenoir City Animal Clinic; $37.43 to FedEx Office; $118.51 to AT&T; $50.25 to Regal Cinemas; $113.80 to DirecTv; $37.75 to Wilco; $51.99 to Shell Oil Company; $70.00 to Ruby Tuesday; $26.60 to Firehouse Subs; $30.93 to Tractor Supply; $1,335.28 to Lance Cunningham Ford; $24.00 to Ross the Boss; $18.48 to Cracker Barrel; $20.47 to Panera Bread; $19.26 to Lincoln's Sports Grille; $15.37 to Anderson County; $25.00 to Knoxville HMA Cardiology; $178.89 to Tennessee Farmers Insurance; $20.35 to McDonalds; $9.05 to Salsaritas; $1,000.00 to Chase; $200.00 to Kohl's; $16.38 to Target; and $310.68 to Verizon Wireless.  COLL. TRIAL EX. 19.

COLL. TRIAL EX. 19. In December 2011, the transaction printout reflects payroll deposits totaling $1,476.50, no payments to the Chapter 13 Trustee, a $150.00 deposit from an unknown source, ATM withdrawals totaling $1,585.25, unidentified checks totaling $22.30, additional debits totaling $2,042.05,[8] and an ending balance of $330.09. COLL. TRIAL EX. 19.

Following dismissal of his 2011 Bankruptcy Case on December 16, 2011, the transaction printout for the ORNL Federal Credit Union account reflects deposits from unknown sources and continues to show ATM withdrawals and miscellaneous spending between January and July 2012. In January 2012, the transaction printout reflects deposits totaling $6,521.54, ATM withdrawals totaling $400.00, additional debits totaling $1,045.96,[9] and an ending balance of $5,405.67. COLL. TRIAL EX. 19. In February 2012, the transaction printout reflects deposits totaling $220.00, ATM withdrawals totaling $1,208.50, unidentified checks totaling $435.00, additional debits totaling $2,722.07,[10] and an ending balance of $1,512.84. COLL. TRIAL EX. 19. In March 2012, the

---

[8] Specifically, the December 2011 statement reflects that the following aggregate amounts were spent on the following: $19.36 to Taco Bell; $538.07 to Weigels; $63.65 to Walgreens; $25.00 to Ross the Boss; $248.57 to Wal-Mart; $12.95 to TIVO; $43.54 to Target; $25.11 to Bed, Bath & Beyond; $118.43 to AT&T; $113.80 to DirecTv; $7.22 to Shell Oil Company; $38.84 to Cracker Barrel; $166.63 to Finish Line; $9.45 to Chick-fil-a; $21.00 to Regal Cinemas; $12.99 to Dollar Tree; $27.30 to Holiday Mall Photos; $39.39 to Food City; $209.53 to Fort Sanders Regional PHA; $22.21 to FedEx Office; $178.89 to Tennessee Farmers Insurance; $26.44 to CVS Pharmacy; $16.01 to Tractor Supply; $50.88 to Exxon/Mobil; and $6.79 to Sonic. COLL. TRIAL EX. 19.

[9] Specifically, the January 2012 statement reflects that the following aggregate amounts were spent on the following: $20.00 to The Rush; $50.00 to Oak Ridge Utility District; $4.70 to Redbox; $293.55 to Wal-Mart; $6.33 to Chick-fil-a; $198.82 to Weigels; $87.39 to McAfee; $113.80 to DirecTv; $12.95 to TIVO; $8.91 to Joann Stores; $3.84 to Walgreens; $6.70 to Food City; $16.94 to Target; $17.40 to VF Cooperative; $25.74 to Shell Oil; and $178.89 to Tennessee Farmers Insurance. COLL. TRIAL EX. 19.

[10] Specifically, the February 2012 statement reflects that the following aggregate amounts were spent on the following: $77.77 to Simmons BP; $925.06 to Weigels; $16.48 to Kroger; $11.00 to 3-Minute Magic; $27.27 to Brixx; $31.40 to Family Bowl; $404.92 to Wal-Mart; $69.78 to Exxon/Mobil; $55.07 to Shell Oil Company; $8.73 to Vic and Bills; $24.74 to Roane County Clerk; $345.00 to City of Oak Ridge; $35.20 to Hacienda Degollado; $31.17 to Walgreens; $60.00 to Radio Shack; $75.61 to Snappy Tomato; $29.31 to Raceway; $68.54 to Dish Network-One; $3.50 to FedEx Office; $15.33 to Ruby Tuesday; $54.52 to Bradley's Chocolate; $13.16 to Staples; $56.72 to Kenjo Market; (continued...)

transaction printout reflects deposits totaling $1,885.88, a credit from Dish Network-One in the amount of $68.54, ATM and cash withdrawals totaling $410.00, unidentified checks totaling $820.00, additional debits totaling $2,005.38,[11] a $35.00 overdraft fee, and an ending balance of $126.88.  COLL. TRIAL EX. 19.

In April 2012, after the filing of the 2012 Bankruptcy Case, the transaction printout reflects payroll deposits from IDEV totaling $4,201.50, an additional deposit of $1,776.00 from an unknown source, ATM and cash withdrawals totaling $1,240.00, unidentified checks totaling $215.29, additional debits totaling $2,247.69,[12] a $35.00 overdraft fee, and an ending balance of $2,281.40. COLL. TRIAL EX. 19.  In May 2012, the transaction printout reflects a federal tax refund in the amount of $8,763.00, payroll deposits from IDEV totaling $1,888.50, ATM and cash withdrawals totaling $5,400.00, unidentified checks totaling $885.00, additional debits totaling $4,352.09,[13] and

---

[10](...continued)
$178.89 to Tennessee Farmers Insurance; $25.22 to Advance Stores; $2.72 to Hardees; $4.64 to Chick-fil-a; $14.74 to CVS Pharmacy; $27.00 to Ross the Boss; $24.09 to Home Depot; and $4.49 to Parkwest Dietary Office.  COLL. TRIAL EX. 19.

[11] Specifically, the March 2012 statement reflects that the following aggregate amounts were spent on the following:  $9.84 to Lowe's; $388.81 to Weigels; $15.31 to Walgreens; $7.59 to Kenjo Market; $255.70 to Wal-Mart; $3.35 to FedEx Office; $15.10 to Big Lots; $58.45 to Exxon/Mobil; $63.96 to GRE*GMCR/Keurig; $32.15 to Lenoir City Animal Clinic; $281.11 to Kroger; $132.92 to Shell Oil Company; $17.98 Noodles Co.; $5.44 to Parkwest Dietary Office; $25.00 to Rush Fitness; $80.95 to M&S Quick Mart; $32.00 to Time to Shine Car Wash; $25.57 to Snappy Tomato; $25.33 to State Farm Insurance; $10.38 to Ross the Boss; $40.59 to Food City; $178.89 to Tennessee Farmers Insurance; and $298.96 to Verizon Wireless.  COLL. TRIAL EX. 19.

[12] Specifically, the April 2012 statement reflects that the following aggregate amounts were spent on the following:  $20.00 to The Rush; $28.33 to Big Lots; $225.78 to Wal-Mart; $427.86 to Weigels; $8.08 to Lenny's Sub Shop; $291.45 to Lenoir City Animal Clinic; $187.61 to City of Oak Ridge; $92.81 to Elliott's; $436.73 to Verizon Wireless; $24.33 to State Farm Insurance; $25.87 to Advance Stores; $141.99 to Finish Line; $178.89 to Tennessee Farmers Insurance; $20.00 to Time to Shine Car Wash; $17.61 to Kroger; $27.00 to Ross the Boss; $72.31 to Kenjo Market; and $21.04 to Kangaroo Express.  COLL. TRIAL EX. 19.

[13] Specifically the May 2012 statement reflects that the following aggregate amounts were spent on the following:  $27.79 to Sullivans; $10.00 to The Rush; $347.07 to Weigels; $7.41 to Exxon/Mobil; $32.15 to Lenoir City

(continued...)

an ending balance of $2,596.59. COLL. TRIAL EX. 19. In June 2012, the transaction printout reflects

payroll deposits from IDEV totaling $1,537.00, an additional deposit of $300.00 from an unknown

source, ATM and cash withdrawals totaling $2,340.00, additional debits totaling $1,369.57,[14] and

an ending balance of $724.02. COLL. TRIAL EX. 19. In July 2012, the transaction printout which

ends as of July 21, 2012, reflects deposits totaling $480.00 from unknown sources, ATM and cash

withdrawals totaling $705.00, additional debits totaling $541.48,[15] and an ending balance of

$2,281.40. COLL. TRIAL EX. 19.

    With respect to his bank records from Knoxville TVA Employees Credit Union and the fact

that the majority of them were the first pages only of each monthly statement, the Defendant testified

that because he could not locate most of his records, he obtained copies from the credit union and

only produced the first page of ten monthly bank statements because he could not afford to purchase

---

[13](...continued)
Animal Clinic; $724.10 to Extended Stay; $333.99 to Wal-Mart; $5.50 to Ruby Tuesday; $104.79 to Walgreens; $126.20 to Raceway; $16.88 to M&M Catering; $55.85 to Kenjo Market; $59.61 to Kroger; $31.03 to Lincoln Sports Grille; $108.00 to Challenger Sports Corp.; $6.29 to Home Depot; $127.80 to Hilton Garden Inn; $10.76 to Waffle House; $60.53 to Ross the Boss; $867.51 to Hampton Inns; $7.68 to FedEx Office; $3.17 to Metro Knoxville HMA Gift; $103.83 to Shell Oil Company; $24.33 to State Farm Insurance; $112.99 to Comcast; $314.38 to Verizon Wireless; $5.27 to Redbox; $9.82 to Burke's Outlet; $15.11 to Gigi's Cupcakes; $33.96 to Ridge Florist; $65.33 to Abuelos; $17.76 to Big Lots; $24.61 to Dead End BBQ; $7.92 to Lenny's Sub Shop; $33.59 to Auto Zone; $178.89 to Tennessee Farmers Insurance; $28.76 to Food City; $21.23 to CostPlus; $25.67 to Snappy Tomato; $39.33 to Soccer Post of Tennessee; $17.37 to Soccer USA, Inc.; $39.02 to Roane County Clerk; and $158.81 to Townplace Suites. COLL. TRIAL EX. 19.

    [14] Specifically, the June 2012 statement reflects that the following aggregate amounts were spent on the following: $22.76 to United Grocery Outlet; $35.00 to Kroger Fuel Center; $34.19 to Walgreens; $112.99 to Comcast; $2.63 to Redbox; $90.24 to Food City; $57.42 to Kenjo Market; $39.94 to Exxon/Mobil; $298.31 to Weigels; $64.04 to Dollar General; $24.33 to State Farm Insurance; $17.42 to Advance Stores; $19.95 to CBI*Cleverbridge, Inc.; $29.52 to Walgreens; $44.00 to Raceway; $22.75 to Dollar Tree; $34.03 to Lincoln's Sports Grille; $136.54 to Best Buy; $3.00 to FedEx Office; $27.59 to Snappy Tomato; $33.48 to Rafferty's; $18.32 to CVS Pharmacy; $178.89 to Tennessee Farmers Insurance; and $22.23 to Big Lots. COLL. TRIAL EX. 19.

    [15] Specifically, the July 2012 statement reflects that the following aggregate amounts were spent on the following: $97.30 to Wal-Mart; $63.34 to Food City; $127.96 to Weigels; $178.89 to Tennessee Farmers Insurance; $14.26 to Walgreens; $11.00 to Snappy Tomato; $29.00 to Ross the Boss; and $19.73 to Advance Stores. COLL. TRIAL EX. 19.

the entire statement for each missing month. Those ten bank statements, for the time period of

March 2010 through November 2010, and January through February 2011, reflect total deposits of

$143,022.44 and $120,113.81 in miscellaneous debits without the benefit of detailed explanations

of the transactions. When questioned about those miscellaneous debits at trial, the Defendant stated

that he made a lot of money and spent a lot of money, but he could not account for or provide that

information. Similarly, the record reflects that the Defendant was also unable to identify to whom

several miscellaneous debits were paid during his July 2012 deposition.

As for the three months in which the Defendant's statements provide details, they, like the

statements provided for the ORNL Federal Credit Union account, reflect that a great deal of money

was spent by the Defendant on eating out, entertainment, and purchasing retail items. The December

2010 statement reflects a beginning balance of $8,276.17, payroll deposits totaling $13,344.55, a

credit from Belk in the amount of $196.65, a $600.00 transfer to share account #-00, transfers

totaling $2,000.00 to loan #-07, ATM and cash withdrawals totaling $4,211.95, unidentified checks

totaling $1,583.40, additional debits totaling $7,750.54,[16] and an ending balance of $4,996.48. TRIAL

---

[16] Specifically, the December 2010 statement reflects that the following aggregate amounts were spent on the following: $45.75 to Kenjo Markets; $501.16 to Wal-Mart; $196.46 to Walgreens; $150.00 to Reptrax; $25.50 to Subway; $12.76 to Dollar General; $174.50 to Marriott; $306.16 to Panera Bread; $280.26 to Chef's Pizzeria; $425.11 to Chase; $43.85 to Shell Oil; $129.38 to Mangia Pizza; $141.81 to Lowe's; $49.47 to Olive Garden; $106.77 to Justice; $348.06 to Lange's Liquor Store; $184.67 to Kroger; $68.42 to Food City; $15.84 to USPO; $23.03 to Med-Payment.com; $267.22 to Bed, Bath & Beyond; $6.42 to Marble Slab Creamery; $62.19 to Target; $6.54 to Exxon/Mobil; $32.93 to Sam's Café; $75.30 to Big Lots; $291.38 to Weigels; $2.72 to FedEx Office; $18.88 to Office Max; $70.97 to Best Buy; $379.65 to Dillard's; $196.65 to Belk; $1,144.58 to Verizon Wireless; $60.00 to Red Lobster; $12.62 to Anderson County Farmer's Market; $3.06 to Chick-fil-a; $54.41 to Farragut Cleaners; $400.00 to American Funds; $27.94 to Waffle House; $20.73 to UPS Store; $41.60 to China King Buffet; $178.89 to Tennessee Farmers Insurance; $3.27 to Redbox; $109.55 to Rack Room Shoes; $26.71 to Firehouse Subs; $69.57 to Books-a-Million; $20.00 to Ross the Boss; $3.93 to JCPenney; $2.20 to Parkwest Medical Center Café; $2.84 to Sonic; $103.80 to DirecTv; $12.00 to Car Wash Clinic; $9.18 to United Grocery Outlet; $32.50 to Regal Cinemas; $32.76 to Holiday Mall Photos; $46.89 to Sam's Club; $24.74 to CVS Pharmacy; $51.13 to Bath & Body Works; $5.10 to Piggly Wiggly; $111.79 to AT&T; $78.61 to Honeybaked Ham; $59.22 to Fresh Market; $47.75 to Murphy; $88.80 to Tractor Supply

(continued...)

EX. 14.  The March 2011 statement reflects a beginning balance of $8,276.17, payroll deposits

totaling $12,235.61, a $315.00 transfer to loan #-01, a $336.00 transfer to loan #-07, ATM and cash

withdrawals totaling $6,492.95, unidentified checks totaling $1,218.82, additional debits totaling

$5,483.83,[17] and an ending balance of $1,722.97.  TRIAL EX. 16.  The April 2011 statement reflects

a beginning balance of $1,722.97, payroll deposits totaling $12,722.29, various transfers, advances,

and refunds totaling $1,272.87 into the account, a $315.00 transfer to loan #-01, a $336.00 transfer

to loan #-07, ATM and cash withdrawals totaling $1,620.00, unidentified checks totaling $692.57,

additional debits totaling $3,960.45,[18] and an ending balance of $8,794.07.  TRIAL EX. 17.

Additionally, the Defendant gave conflicting testimony at trial concerning transfers of money

to and from his bank accounts in the months subsequent to his bankruptcy filing.  Specifically, a

deposit in the amount of $11,000.00 was made into the ORNL checking account on November 8,

---

[16](...continued)
Co.; $43.75 to Carmike Cinemas; $17.92 to Newk's Express Café; $12.95 to TIVO Service; $45.92 to M & S Quick
Mart; $26.50 to Tinseltown; $28.52 to JB's Wine & Spirits; and $49.00 to The Rush.  TRIAL EX. 14.

[17] Specifically, the March 2011 statement reflects the following aggregate amounts to the following:  $341.47
to Weigels; $117.55 to Lowe's; $497.83 to Wal-Mart; $17.79 to China King Buffet; $469.96 to Lance Cunningham Ford;
$30.21 to Chop House; $231.74 to Pizza Hut; $144.16 to Lange's Liquor Store; $65.13 to Pilot; $139.80 to Marriott;
$3.82 to Sonic; $323.04 to Kroger; $77.60 to Walgreens; $18.60 to Panera Bread; $18.31 to KFC; $400.00 to American
Funds; $178.89 to Tennessee Farmers Insurance; $31.92 to Ott's BBQ; $301.40 to Verizon Wireless; $64.08 to Sears;
$253.29 to Shell Oil; $38.17 to Carolina Pottery; $25.51 to FedEx Office; $19.50 to Sam's Café; $31.82 to Lenoir City
Animal Clinic; $25.90 to Allstate Truckstop; $8.50 to Marble Slab Creamery; $11.00 to 3-Minute Magic; $112.64 to
AT&T; $7.21 to 7-Eleven; $110.71 to Florida's Seafood; $70.00 to Twister Airboat Rides; $9.52 to DNPS Kennedy
Space Center; $55.60 to Hilton; $71.28 to E-Z Mart; $27.30 to Dixie Lee Wines & Liquors; $12.95 to TIVO; $1,000.00
to Chase; $60.63 to Claire's Boutique; $10.00 to CVS Pharmacy; and $49.00 to The Rush.  TRIAL EX. 16.

[18] Specifically, the April 2011 statement reflects the following aggregate amounts to the following:  $20.40 to
CVS Pharmacy; $16.21 to FedEx Office; $5.44 to Michaels; $519.55 to Weigels; $10.98 to Mike's Fixit Shop; $72.08
to Lange's Liquor Store; $14.44 to Shell Oil Company; $118.45 to Walgreens; $12.51 to Jet's Pizza; $28.39 to Frontier
Package; $11.42 to Dick's; $32.75 to Best Buy; $31.95 to M&M Catering; $263.59 to Kroger; $282.02 to Wal-Mart;
$10.38 to Pilot; $34.42 to Gallaher Grill; $8.08 to Sonic; $27.30 to Dixie Lee Wines; $186.24 to Home Depot; $33.88
to Big Lots; $321.34 to Gap; $30.65 to Sam's Package Store; $400.00 to American Funds; $178.89 to Tennessee
Farmers Insurance; $190.80 to Chef's Pizzeria; $229.89 to Marriott; $269.26 to Panera Bread; $114.63 to DirecTv;
$199.11 to La Carreta; $112.64 to AT&T; $65.71 to Food City; $9.92 to Starbucks; $31.00 to Ross the Boss; $12.95
to TIVO; $24.91 to Zaxby's; and $28.27 to Chop House.  TRIAL EX. 17.

2012.  TRIAL EX. 26.  When questioned about this deposit, the Defendant testified that he had cashed

out his Roth IRA without telling Mrs. Ward; however, as previously discussed, the only Roth IRA

that the Defendant disclosed in his Schedule B was a jointly owned account with Mrs. Ward in

which the Defendant stated that his interest was $16,000.00.  During her testimony, Mrs. Ward

relayed to the court her surprise when she learned of the deposit as well as the $5,000.00 withdrawal

made on November 15, 2012, and she was unable to identify either the source of the funds or the

disposition thereof.  Similarly, on April 9, 2012, a deposit in the amount of $1,276.00 was made to

the Defendant's and Mrs. Ward's checking account with ORNL Federal Credit Union; however, the

Defendant could not identify the source of that deposit or what had happened to the funds, and

Mrs. Ward's testimony that she did not know the course of the deposit but does not think that they

received an insurance refund in such a large amount was credible.

Based on the foregoing, the court finds that the Defendant was, immediately prior to and even

after the filing of his 2012 Bankruptcy Case, in possession of large sums of money that he is no

longer in possession of and cannot adequately account for.  Accordingly, the Defendant's discharge

will also be denied under § 727(a)(5).

### C

The Plaintiff also objects to the Defendant's discharge under § 727(a)(3) for failing to

produce documentation "with enough information to ascertain [his] financial condition and track

[his] financial dealings with substantial accuracy for a reasonable period past to present."  *Wazeter v.*

*Mich. Nat'l Bank (In re Wazeter)*, 209 B.R. 222, 227 (W.D. Mich. 1997) (citations omitted).

23

Although not required to provide "perfect, or even necessarily complete, records[,]" *CM Temp. Servs. v. Bailey (In re Bailey)*, 375 B.R. 410, 415 (Bankr. S.D. Ohio 2007), a debtor must provide the trustee and creditors with sufficient information concerning his or her financial history and current financial affairs since "[c]reditors are not required to risk having the debtor withhold or conceal assets 'under the cover of a chaotic or incomplete set of books or records.'" *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992) (quoting *Cox v. Lansdowne (In re Cox)*, 904 F.2d 1399, 1401 (9th Cir. 1990)). Debtors are responsible for providing sufficient financial information; the trustee and creditors are not required to investigate and acquire records. *Babb*, 358 B.R. at 353-54. "The test is not whether the debtor could determine what was happening in his business, but [rather] whether a third-party such as a trustee or creditor could determine from the records what has happen[ed] in the debtor's business." *Stephens v. Morrison (In re Morrison)*, 450 B.R. 734, 747 (Bankr. W.D. Tenn. 2011) (citations omitted).

Under § 727(a)(3), the Plaintiff bears the initial burden of proof that the Defendant "has failed to maintain adequate books and records and that such failure renders it impossible to discern [his] true financial condition[,]" *Christy v. Kowalski (In re Kowalski)*, 316 B.R. 596, 601 (Bankr. E.D.N.Y. 2004), and if the records are proven inadequate, the burden shifts to the Defendant to prove that the failure to maintain sufficient records was justified under the specific circumstances of his case. *Babb,* 358 B.R. at 354 (citing *Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 883 (B.A.P. 6th Cir. 1999)). Intent is not an element under § 727(a)(3), leaving the courts to determine the adequacy of a debtor's records on a case by case basis and giving judges broad discretion to deny

24

discharge based upon inadequately kept books and records. *Babb*, 358 B.R. at 354 (citations omitted).

> The Bankruptcy Code does not require a debtor seeking a discharge specifically to maintain a bank account, nor does it require an impeccable system of bookkeeping. Nevertheless, the records must "'sufficiently identify the transactions [so] that intelligent inquiry can be made of them.' The test is whether 'there [is] available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained.'"

*Alten*, 958 F.2d at 1230 (quoting *In re Decker*, 595 F.2d 185, 187 (3d Cir. 1979) (citations omitted)).

Instead, records should be measured "against the type of books and records kept by a reasonably prudent debtor with the same occupation, financial structure, education, and experience." *Wazeter*, 209 B.R. at 227 (citations omitted). Additional factors include:

> (1) whether the debtor was engaged in business, and if so, the complexity and volume of the business; (2) the amount of the debtor's obligations; (3) whether the debtor's failure to keep or preserve books and records was due to the debtor's fault; (4) the debtor's education, business experience and sophistication; (5) the customary business practices for record keeping in the debtor's type of business; (6) the degree of accuracy disclosed by the debtor's existing books and records; (7) the extent of any egregious conduct on the debtor's part; and (8) the debtor's courtroom demeanor.

*Lufkin*, 393 B.R. 585 at 593 (citations omitted). "Examples of inadequate disclosures include the failure to produce checking account statements, tax returns, household bills and/or credit card records, loan documentation, pay records, and real estate closing statements." *Babb*, 358 B.R. at 354 (citations omitted).

The Plaintiff has argued that although the Defendant produced some of the bank records it subpoenaed in the State Court Lawsuit in February 2012, he has not produced all records for the one-year period prior to the filing of the 2012 Bankruptcy Case and that he only produced the first

page of some statements.  At trial, Mr. Conrad introduced into evidence Trial Exhibit 29, which was

a subpoena to the Defendant to produce "any and all financial records inclusive of but not exclusive

to checking and savings accounts, payroll stubs, cancelled checks, tax records for the past two years,

and any other fiancial [sic] records[.]" TRIAL EX. 29.  Mr. Conrad testified that in response to the

subpoena, the Defendant brought records for his bank account with ORNL Federal Credit Union but

that he did not supply the Plaintiff with photocopies and did not produce any records for his closed

Knoxville TVA Employees Credit Union account.  In response to Mr. Conrad's testimony, the

Defendant testified that he did not keep his bank records with Knoxville TVA Employees Credit

Union after he closed the account in May 2011, but that he made a good faith effort, within his

limited financial means, to provide the Plaintiff with the records it subpoenaed and, in preparation

for the trial of this adversary proceeding, found one or two statements and paid for the first pages

of his bank statements from Knoxville TVA Employees Credit Union for the remainder of the period

from March 2010 through July 2011.  *See* COLL. TRIAL EX. 13; COLL. TRIAL EX. 14; COLL.

TRIAL EX. 15; COLL. TRIAL EX. 16; COLL. TRIAL EX. 17; COLL. TRIAL EX. 20.  The Defendant also

argues that his failure to maintain financial records was justified due to his alcohol dependency and

life-altering events that occurred, including hospitalization and rehabilitation.

There is no dispute that the Defendant did produce records to the Plaintiff, including bank

statements that he paid for with limited funds and tax returns for 2010 and 2011.  The record also

supports the Defendant's testimony that Mrs. Ward was primarily responsible for their household

finances, including record-keeping.  Nevertheless,  the Defendant is not an unsophisticated person.

He worked in medical device sales with Abbott Laboratories until October 2011.  Notwithstanding

his current disability due to his alcohol dependency, the Defendant did not maintain complete financial records, and his spending information, in particular, could not be ascertained from a review of the bank records he did produce, nor was he able to provide the Plaintiff or the court with any specifics concerning the financial transactions contained therein.  He was also unable to identify the source of large non-payroll deposits.  In light of the foregoing, particularly the Defendant's inability to account for the large amount of money that was spent over the course of the previous years, the court likewise finds that the requirements of § 727(a)(3) have been met sufficient to likewise deny discharge under that subsection.[19]

## III

In summary, the Plaintiff has met its burden of proof, and the Defendant will be denied his discharge under 11 U.S.C. § 727(a)(3), (4)(A), and (5).

A Judgment consistent with this Memorandum will be entered.

FILED:  September 30, 2013

BY THE COURT

*/s/  RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE

---

[19] Because the court has determined that the Defendant's discharge will be denied under § 727(a)(3), (4)(A), and (5), it is not necessary to address the Plaintiff's arguments under subsection (2).